IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

SULAIMAN ALMUBARAK,

Plaintiff,

v.

Civil Action No. 1:19-cv-00358-LO-TCB

IBRAHIM SHAHIN and
LIV LUXURY GROUP, LLC,

Defendants.

---

**SECOND AMENDED COMPLAINT**

---

Plaintiff Sulaiman Almubarak alleges on personal information as to his own acts and on information and belief as to all other matters, as follows:

**INTRODUCTION**

This action arises from two separate sets of wrongful actions. First, defendant Ibrahim Shahin formed a criminal enterprise with defendant Liv Luxury Group, LLC ("Liv Luxury") and made false representations to Almubarak for the purpose of inducing him to invest $500,000 for a 50% ownership interest in Liv Luxury. Second, Shahin breached an agreement with Almubarak to split a commission of $333,333.33 for work done in securing the release of certain funds from Saudi Arabia in favor of a third-party, the MNG Group of Companies ("MNG").

With regard to the first set of wrongful actions, Shahin concealed from Almubarak that he previously sold that same ownership interest to a third party, Amr Shoukry. After Almubarak deposited $250,000 in Liv Luxury's checking account, he learned about Shahin's prior sale to Shoukry, and he demanded from Shahin repayment of the $250,000. Shahin refused to repay the $250,000 and has absconded with it, leaving Almubarak with nothing. Shahin has retained this

$250,000 and continues to represent that he has an ownership interest in Liv Luxury, which he can use to perpetuate his unlawful scheme with Liv Luxury in the future. By perpetrating this fraud, defendants violated the U.S. Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and Shahin also committed fraud and breached his contract with Almubarak. On the basis of his RICO claim, Almubarak is entitled to treble damages of $750,000 with pre-judgment interest at 6%, plus attorneys' fees and costs.

With regard to the second set of wrongful actions, Shahin and Almubarak agreed to evenly split a commission of $333,333.33 for work they performed to assist in the release in Saudi Arabia of $12 million owed to MNG. However, in breach of that agreement, Shahin pocketed the full $333,333.33, and he has refused to pay Almubarak his half of that commission. Almubarak is entitled to his 50% share of that commission, which is $166,666.67.

**PARTIES**

1. Plaintiff Sulaiman Almubarak is a citizen and resident of Saudi Arabia, and he is neither lawfully admitted for permanent residence in the United States nor domiciled in Virginia.

2. Defendant Ibrahim Shahin is a citizen of the United States and a resident of Virginia.

3. Defendant Liv Luxury is incorporated and has its principal place of business in Virginia.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a substantial part of this action arises under the laws of the United States.

5. The Court also has jurisdiction under 28 U.S.C. § 1332(b)(2) because the litigation is between a citizen of a foreign country and citizens of Virginia and the amount in controversy exceeds $75,000.

6. Venue is proper in this Court because defendants reside in the Eastern District of Virginia and a substantial part of the events giving rise to this claim occurred in this district. *See* 28 U.S.C. § 1391(b)(1), (2).

## FACTUAL ALLEGATIONS

### A. The Fraudulent Scheme Involving Liv Luxury

7. Shahin formed Liv Luxury for the purpose of sub-letting luxury apartments to tourists visiting in the Washington, D.C. metropolitan area. Shahin and Liv Luxury operate a website on the Internet for the purposes of marketing rental apartments and soliciting reservations throughout the United States and worldwide.

8. On December 29, 2017, Shahin and Amr Shoukry executed an "Agreement to Purchase Limited Liability Company Interest" (the "First Purchase Agreement").

9. In this First Purchase Agreement, Shahin represented that he was the owner of Liv Luxury, and that he was selling a 51% interest in Liv Luxury to Shoukry for $300,000. The terms of the transaction were that, within ten days of the execution of the First Purchase Agreement, Shoukry was required to make a one-time payment of $180,000 by wire transfer, cashier's check, or cash to Shahin and to deposit $120,000 to the Liv Luxury bank account.

10. On January 2, 2018, Shahin and Shoukry executed an "Operating Agreement of Liv Luxury Group, LLC" (the "First Operating Agreement"). The First Operating Agreement recited that, with the execution of the First Purchase Agreement, Shoukry owned 51% of Liv Luxury and Shahin owned 49% of Liv Luxury.

11. In fulfillment of the First Purchase Agreement, Shoukry paid Shahin $180,000 by check from his checking account at TD Bank on January 9, 2018, and Shoukry paid Liv Luxury Group $120,000 by official TD Bank check on January 25, 2018.

12. Under the terms of the First Operating Agreement, Shahin and Shoukry were the two member-managers of Liv Luxury, and all major decisions regarding Liv Luxury's operations were required to be made unanimously by the two member-managers.

13. In June 2018, Almubarak came to the United States and met Shahin in Virginia.

14. Without informing Shoukry, and notwithstanding the provisions of the First Operating Agreement requiring all major decisions regarding Liv Luxury's operations to be made unanimously by Shahin and Shoukry, Shahin represented to Almubarak that he was the 100% owner of Liv Luxury, which he described as a company that sub-lets luxury apartments to tourists. Shahin concealed from Almubarak that Shahin previously had sold a 51% interest in Liv Luxury to Shoukry.

15. Shahin represented to Almubarak that, if Almubarak invested $500,000 in Liv Luxury, he would acquire a 50% interest in Liv Luxury and would earn substantial profits.

16. However, from the start, Shahin intended only to use Liv Luxury to defraud Almubarak of his investment, and Shahin never intended actually to make Almubarak an owner of any interest in Liv Luxury.

17. Shahin drafted a "Sale Contract" and an "Operating Agreement of Liv Luxury Group, LLC" (the "Second Operating Agreement"), both dated August 5, 2018, to memorialize the parties' agreement and transaction. Shahin sent the Sale Contract and Second Operating Agreement to Almubarak via two e-mails on August 6, 2018.

18. The Sale Contract provided that Shahin was selling 50% of Liv Luxury to Almubarak for $500,000, the payments to be made in yearly installments in amounts not yet determined. The Second Operating Agreement stated that, following the sale, Almubarak and Shahin would each own 50 percent of Liv Luxury, and that Liv Luxury would be operated by its two member-managers.

19. Although the parties did not sign the Sale Contract or the Second Operating Agreement, they agreed to accept their terms. Therefore, the Sale Contract and the Second Operating Agreement are valid and binding contracts between Shahin and Almubarak.

20. On August 8, 2018, Shahin accompanied Almubarak to the Citibank office at 8516 Leesburg Pike, Vienna, Virginia. Shahin and Almubarak met with Usama Hassan, Assistant Vice President at this Citibank office, and Shahin introduced Almubarak as his partner at Liv Luxury. On the basis of Shahin's introduction, Usama Hassan opened a Citigold Account in Almubarak' s name. Relying on Shahin's fraudulent misrepresentations, Almubarak deposited $800 on August 8, 2018, into his Citigold Account.

21. On August 13, 2018, Shahin again accompanied Almubarak to the Citibank office in Vienna, Virginia. Shahin and Almubarak met with Milan Cavic, a Citibank Personal Banker, and Shahin again introduced Almubarak as his partner at Liv Luxury. On the basis of Shahin's introduction, Milan Cavic issued Almubarak a CitiBusiness Card printed with the name "Sulaiman A Almubarak Liv Luxury Group LLC." This enabled Almubarak to access Liv Luxury's CitiBusiness Flexible Checking Account. In addition, on August 13, 2018, Citibank sent Almubarak a User ID, temporary Business Code, and Token Serial Number in the name of "Sulaiman Almubarak Liv Luxury Group," to facilitate Almubarak' s access to the Liv Luxury checking account.

22. On August 13, 2018, on the basis of Shahin's fraudulent misrepresentations, Almubarak deposited $780 into his Citigold Account. On that same day, and on the basis of Shahin's fraudulent misrepresentations, Almubarak made wire transfers of $2,180 and $76,965 from his account in Saudi Arabia into his Citigold Account.

23. On August 13, 2018, on the basis of Shahin's fraudulent misrepresentations, Almubarak made a cash withdrawal of $80,000 from his Citigold Account, and the $80,000 was deposited that same day in Liv Luxury's CitiBusiness Flexible Checking Account. This $80,000 deposit into Liv Luxury's CitiBusiness Flexible Checking Account represented the first installment payment by Almubarak under the Sale Contract.

24. On September 7, 2018, on the basis of Shahin's fraudulent misrepresentations, Almubarak made wire transfers of $69,965 and $99,965 from his account in Saudi Arabia into his Citigold Account, and he transferred $170,000 into Liv Luxury's CitiBusiness Flexible Checking Account. This $170,000 transfer into Liv Luxury's CitiBusiness Flexible Checking Account represented the second installment payment by Almubarak under the Sale Contract.

25. After Almubarak returned to Saudi Arabia and throughout the Fall of 2018, Shahin called Almubarak by telephone on multiple occasions, falsely reaffirming that Almubarak was a 50% owner of Liv Luxury and informing Almubarak that Shahin had traveled to Florida for the purpose of signing a contract with a car rental company that would supply cars to tourists who rented from Liv Luxury in Virginia.

26. Later in the Fall of 2018, after Almubarak had deposited or transferred a total of $250,000 into Liv Luxury's CitiBusiness Flexible Checking Account in compliance with the Sale Contract and in reliance on Shahin's fraudulent misrepresentations. Almubarak learned for the first time about Shahin's sale of a 51% interest in Liv Luxury to Shoukry. Almubarak

confronted Shahin about his fraudulent actions and misrepresentations. Almubarak told Shahin that he would not make any further deposits in Liv Luxury's account and he demanded repayment in full of the $250,000 he already deposited or transferred.

27. Shahin refused to repay any of the $250,000 to Almubarak. To date, Shahin has refused to account for the use or whereabouts of the $250,000 Almubarak deposited or transferred into Liv Luxury's account, and Shahin has absconded with that money. Instead, Shahin has retained the $250,000 and represents that he continues to have an ownership interest in Liv Luxury.

28. Meanwhile, Shoukry learned about Shahin's dealings with Almubarak and demanded the return of the $300,000 he had paid Shahin and Liv Luxury for a 51% interest in Liv Luxury. Shahin signed an agreement with Shoukry on December 11, 2018, to re-purchase Shoukry's interest for $325,000, with a first immediate payment of $75,000 and the balance of $250,000 to be paid under the terms of a promissory note. The promissory note, entitled "Secured Promissory Note with Confession of Judgment" and dated December 11, 2018, requires Shahin to pay Shoukry $5,000 per month beginning January 1, 2019, and to make two final payments to Shoukry of $95,000 each on January 1, 2020, and February 1, 2020.

**B. The Commission**

29. On July 15, 2018, while Almubarak was in Fairfax County, Shahin arranged a meeting between Almubarak and Nehir Yardimci, who was renting a unit at Liv Luxury.

30. Yardimci told Almubarak that MNG, a Turkish company with which Yardimci was affiliated, had completed a project in Saudi Arabia, and that $12 million owed to MNG was being held in Saudi Arabia. Yardimci said that MNG was seeking assistance with someone who had connections in Saudi Arabia and could secure the release of the $12 million.

31. In consideration of their mutual arrangements, undertakings, and representations, Shahin and Almubarak agreed that Almubarak would arrange for a meeting to take place in Saudi Arabia between Almubarak' s brother, Dr. Nasser Almubarak, who had connections in Saudi Arabia, and Mehmet Gunal, the chairman of MNG.

32. The meeting between Dr. Nasser Almubarak and Gunal took place on July 18, 2018, in Saudi Arabia. Gunal offered to pay a commission of $1 million if Dr. Almubarak and his associates could arrange for the release of the $12 million to MNG in Saudi Arabia.

33. In consideration of their mutual arrangements, undertakings, and representations, Shahin and Almubarak made an oral agreement that, if Dr. Almubarak successfully secured the release of the $12 million in favor of MNG in Saudi Arabia, and MNG paid the $1 million commission, (i) Dr. Almubarak would retain two-thirds of the commission, in the amount of $666,666.67; (ii) Shahin and Almubarak would evenly split the remaining one-third of $333,333.33, so that each would receive $166,666.67; and (iii) Shahin would pay Yardimci $50,000 from Shahin's share.

34. On or about August 15, 2018, Dr. Nasser Almubarak and his associates successfully secured the release to MNG in Saudi Arabia of the $12 million.

35. On or about August 16, 2018, MNG transferred $1 million to the account belonging to Dr. Nasser Almubarak.

36. On or about August 17, 2018, Dr. Nasser Almubarak transferred $333,333.33 from his account in Saudi Arabia to Almubarak' s account in Saudi Arabia.

37. On August 22, 2018, Almubarak wire transferred $3,983.93 from his account in Saudi Arabia to his Citigold Account, and on August 30, 2018, Almubarak wire transferred an additional $330,950 from his account in Saudi Arabia to his Citigold Account.

38. On September 4, 2018, at the express request and instruction of Shahin, Almubarak transferred $333,333.33 to Liv Luxury's CitiBusiness Flexible Checking Account, with an assurance from Shahin that Shahin would transfer $166,666.67 of that amount to Almubarak in satisfaction of Almubarak' s share of the MNG commission, and that Shahin would transfer the remaining $166,666.67 to himself in satisfaction of Shahin's share of the MNG commission and the $50,000 that Shahin undertook to pay Yardimci.

39. However, in breach of their oral agreement, Shahin has refused to transfer to Almubarak the $166,666.67 representing Almubarak's share of the MNG commission.

**FIRST CLAIM**
**Federal Civil RICO, 18 U.S.C. § 1962(c) (Liv Luxury transaction)**

40. Almubarak incorporates by reference and restates all the preceding paragraphs of this Amended Complaint.

41. Shahin and Liv Luxury violated RICO, 18 U.S.C. § 1962(c), causing injury to Almubarak.

42. Shahin formed and designated Liv Luxury as a RICO enterprise within the meaning of 18 U.S.C. § 1961(4), and Shahin conducted and participated in Liv Luxury's affairs by engaging in a pattern of racketeering activity. Shahin and Liv Luxury functioned as a continuing unit and also had a structure distinct from conducting the pattern of racketeering activity—namely, renting luxury apartments. There may also be other members of the enterprise who are not yet known.

43. The enterprise engaged in, and its activities affected, interstate and foreign commerce through its use of the instrumentalities of interstate and foreign commerce, including e-mail, the Internet, telephone, and wire transfers. The enterprise affected interstate commerce when advertising and renting properties and otherwise conducting business, and when

fraudulently inducing Almubarak to make wire transfers of funds from Saudi Arabia to the United States and to make electronic transfers of those funds to Shahin and Liv Luxury under the false pretense that Almubarak would be granted a 50% interest in Liv Luxury.

44. There are two sets of predicate acts which demonstrate the pattern of racketeering activity engaged in by Shahin and Liv Luxury.

45. The first set of predicate acts of racketeering by Shahin and Liv Luxury occurred when the Shahin and Shoukry executed the First Purchase Agreement on December 29, 2017. Shahin represented that he was the owner of Liv Luxury, and that he was selling a 51% interest in Liv Luxury to Shoukry for $300,000. Shahin did not intend to give Shoukry control of Liv Luxury. In accordance with the First Purchase Agreement, Shahin caused Shoukry to pay Shahin and Liv Luxury $300,000 in two installments in January 2018. Both the Agreement and the funds were transmitted by wire in interstate commerce.

46. Under the terms of the First Operating Agreement between Shahin and Shoukry, the result of the First Purchase Agreement was supposed to be that Shoukry owned 51% of Liv Luxury and Shahin owned 49% of Liv Luxury. All major decisions regarding Liv Luxury's operations were required to be made unanimously by the two member-managers.

47. However, without Shoukry's knowledge, Shahin fraudulently sold a 50% interest in Liv Luxury, which he did not own, to Almubarak.

48. When Shoukry found out about this fraudulent sale, he demanded the return of the $300,000 he had paid Shahin. As a result, Shahin executed an agreement to "repurchase" Shoukry's interest in Liv Luxury for $325,000, with an immediate payment of $75,000 and payments totaling $250,000 over a period of two years.

49. The second set of predicate acts of racketeering by Shahin and Liv Luxury occurred in August 2018, when Shahin purported to sell a 50% interest in Liv Luxury, which he did not own, to Almubarak.

50. On or about August 6, 2018, Shahin used e-mail to transmit to Almubarak the Sale Contract, which fraudulently claimed that Shahin would sell 50% of Liv Luxury to Almubarak in consideration of $500,000. Shahin also used e-mail to transmit to Almubarak the Second Operating Agreement, which fraudulently represented that, following the sale, Almubarak and Shahin would each own 50% of Liv Luxury.

51. Shahin drafted these documents and made these misrepresentations, which he then transmitted electronically through interstate commerce, despite his knowledge that he did not have a 50% interest to sell because he had already sold a 51% interest to Shoukry and with intent to defraud Almubarak.

52. Shahin, through his fraudulent misrepresentations, caused Almubarak to make wire transfers of funds from Saudi Arabia to the United States and electronic transfers of those funds during August and September 2018, when Almubarak transferred funds from his Citibank account to Liv Luxury's checking account at Citibank.

53. Shahin perpetuated the fraudulent scheme by placing multiple telephone calls from Virginia to Almubarak in Saudi Arabia in the Fall of 2018 to tell Almubarak about Shahin's travel to Florida for the purpose of signing a contract with a rental car company that would supply cars to tourists who rented from Liv Luxury in Virginia. Shahin's representations were intended to continue to deceive Almubarak into believing that he was a 50% owner of Liv Luxury.

54. Thus, Shahin and Liv Luxury engaged in racketeering activity by committing wire fraud in violation of 18 U.S.C. § 1343. Shahin and Liv Luxury devised or intended to devise a scheme to defraud Shoukry and Almubarak; obtained their money by means of false and fraudulent pretenses, representations, or promises; and transmitted or caused to be transmitted by foreign wire transfers and domestic electronic transfers, writings, signs, or signals for the purpose of executing or attempting to execute that scheme.

55. Shahin and Liv Luxury also engaged in racketeering activity by receiving and possessing money in excess of $5,000 that was knowingly taken by fraud and crossed interstate lines, in violation of 18 U.S.C. § 2315. Shahin and Liv Luxury received and possessed $250,000 that Almubarak transferred in interstate commerce in reasonable reliance on Shahin's fraudulent misrepresentations that the funds would be used to purchase an interest in Liv Luxury.

56. The predicate acts of racketeering by Shahin pose a threat of continuing criminal activities by Shahin and Liv Luxury because Shahin has retained the $250,000 he fraudulently obtained from Almubarak and he continues to assert his ownership of at least a 50% interest in Liv Luxury. Thus, it is reasonably likely that Shahin will fraudulently induce others to purchase at least a 50% interest or otherwise invest in Liv Luxury.

57. The reality of the threat of continuing criminal activities posed by Shahin and Liv Luxury is demonstrated by the fact that Shahin placed multiple telephone calls from Virginia to Almubarak in Saudi Arabia in the Fall of 2018 to tell Almubarak about Shahin's travel to Florida for the purpose of signing a contract with a rental car company that would supply cars to tourists who rented from Liv Luxury in Virginia. Shahin's representations were intended to continue to defraud Almubarak by inducing him to invest more money in Liv Luxury.

58. Almubarak reasonably relied to his detriment on Shahin's fraudulent communications, and defendants' RICO violations caused injury to Almubarak.

59. Almubarak is entitled to an award of three times the damages he sustained, for a total of $750,000 with pre-judgment interest at 6%, as well as the recovery of attorney's fees and costs and any other authorized relief.

**SECOND CLAIM**
**Breach of Contract (Liv Luxury transaction)**

60. Almubarak incorporates by reference and restates all the preceding paragraphs of this Amended Complaint.

61. The Sale Contract is valid contract that existed between Almubarak and Shahin, the terms of which provided that Almubarak would pay $500,000 in exchange for a 50 percent interest in Liv Luxury.

62. Almubarak performed under the contract by transferring $250,000 to Liv Luxury's account, but Shahin breached the contract by absconding with this $250,000 without granting Almubarak any interest in Liv Luxury and without using the $250,000 for any purpose related to the operation of Liv Luxury.

63. Shahin also breached the contract by breaching the implied duty of good faith and fair dealing through his fraud during the inducement and the course of the parties' contractual relationship. Shahin's misrepresentations that he owned 100% of Liv Luxury and would sell 50% to Almubarak were in breach of that implied duty.

64. Almubarak has suffered financial harm by Shahin's breach of contract and should be awarded damages, including compensatory damages, in the amount of $250,000.

**THIRD CLAIM**
**Fraud (Liv Luxury transaction)**

65. Almubarak incorporates by reference and restates all the preceding paragraphs of this Amended Complaint.

66. In seeking to obtain funds from Almubarak, Shahin fraudulently misrepresented material facts about the parties' purchase agreement and the ownership of Liv Luxury, namely, that Shahin owned 100% of Liv Luxury and would transfer a 50% share to Almubarak upon his payment of $500,000.

67. To reiterate, in June 2018, Shahin represented to Almubarak when the two met in Virginia that Shahin was the 100% owner of Liv Luxury, and that, if Almubarak invested $500,000, he would acquire a 50% interest in Liv Luxury.

68. Shahin sent the Sale Contract and Second Operating Agreement to Almubarak via e-mail on August 6, 2018. In those documents, Shahin falsely represented that Shahin owned 100% of Liv Luxury; that Shahin was selling a 50% interest in Liv Luxury to Almubarak; and that Almubarak would become a 50% partner upon transferring $500,000 to Liv Luxury.

69. Shahin accompanied Almubarak to banks on August 8 and 13, 2018, and Shahin represented that Almubarak was his partner at Liv Luxury.

70. At that time, Shahin knew that these representations were false but deliberately misled Almubarak and concealed from Almubarak that Shahin owned only a 49% interest in Liv Luxury and did not own a 50% interest in Liv Luxury that he could sell to Almubarak.

71. At that time, Almubarak did not and could not know about Shahin's misrepresentations.

72. Shahin and Liv Luxury intended that Almubarak would rely on Shahin's misrepresentations and would transfer funds to them, thinking those funds would purchase a 50% interest in Liv Luxury.

73. Almubarak did in fact rely on Shahin's misrepresentations when he transferred $250,000 to Shahin and Liv Luxury under the presumption that he was purchasing a 50% interest in Liv Luxury.

74. Almubarak has suffered financial harm by Shahin's and Liv Luxury's fraudulent misrepresentations and should be awarded damages.

**FOURTH CLAIM**
**Breach of Contract (Commission)**

75. Almubarak incorporates by reference and restates all the preceding paragraphs of this Complaint.

76. The oral agreement that Shahin, Almubarak, and Dr. Nasser Almubarak made regarding the MNG commission is a valid contract among them, the terms of which provided, in relevant part, that Shahin and Sulaiman Almubarak would evenly split one-third of the MNG commission of $1 million, so that each would receive $166,666.67.

77. At the express request and instruction of Shahin, Almubarak transferred $333,333.33 to Liv Luxury, from which Shahin was supposed to retain only $166,666.67 and was contractually bound to transfer $166,666.67 to Almubarak.

78. Shahin has breached the contract by keeping the full $333,333.33 and refusing to remit Almubarak' s contractual share of $166,666.67 to Almubarak.

79. Almubarak has suffered financial harm by Shahin's breach of contract and should be awarded damages, including compensatory damages in the amount of $166,666.67.

**PRAYER FOR RELIEF**

Wherefore, Almubarak respectfully requests the following relief:

(a) On his RICO claim, treble damages pursuant to 18 U.S.C. § 1964(c) of $750,000, with pre-judgment and post-judgment interest at 6%, plus attorneys' fees and costs;

(b) In the alternative and on his fraud and contract claims regarding Liv Luxury, an award of compensatory damages to Almubarak in the amount of $250,000, and consequential and exemplary damages in an amount to be determined at trial, with pre-judgment and post-judgment interest at 6%;

(c) On his contract claim regarding the commission, an award of compensatory damages to Almubarak in the amount of $166,666.67, and consequential and exemplary damages in an amount to be determined at trial, with pre-judgment and post-judgment interest at 6%; and

(d) Such other and further relief as the Court deems just and appropriate, including but not limited to an award of Almubarak' s attorney's fees and costs.

**JURY TRIAL DEMAND**

Almubarak demands trial by jury on all issues so triable.

Dated: August 16, 2019

Respectfully submitted,

/s/ Timothy Bergin
Timothy Bergin (Va. Bar No. 89905)
Neil H. Koslowe (*pro hac vice*)
Lauren B. Kerwin
Potomac Law Group, PLLC
1300 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004
Telephone: (703) 447-4032
Facsimile: (202) 318-7707
Email: tbergin@potomaclaw.com

*Counsel for Plaintiff*